NOT DESIGNATED FOR PUBLICATION

No. 117,693

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of
J.A.D.,
A Minor Child.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; J. PATRICK WALTERS, judge. Opinion filed April 20, 2018. Affirmed.

*Anita Settle Kemp*, of Wichita, for appellant natural mother.

*Julie A. Koon*, assistant district attorney, and *Marc Bennett*, district attorney, for appellee.

Before GARDNER, P.J., ATCHESON and SCHROEDER, JJ.

PER CURIAM: Mother appeals the district court's termination of her parental rights of J.A.D., a minor child born in 2006. The district court found that Mother was unfit, that her conduct was unlikely to change in the foreseeable future, and that termination was in the best interest of J.A.D. Mother has two contentions on appeal: (1) that the district court's finding of unfitness is not supported by clear and convincing evidence and (2) that termination is not in J.A.D.'s best interest. Finding no error, we affirm.

*Factual and procedural background*

Mother is the biological mother of J.A.D., a minor child born in 2006. J.A.D. was removed from Mother's care and placed with Father, the biological father of J.A.D., on

1

August 7, 2014, because Mother "failed to provide a safe and stable living environment" and the Department for Children and Families (DCF) suspected physical neglect, partly attributed to Mother's mental health, anger issues, and domestic disturbances inside the home. At that time, Mother's home had no electricity or water, and DCF had 12 prior intakes of the family. J.A.D. was later removed from Father's care after Father had multiple relapses of methamphetamine use and refused to cooperate with outpatient treatment. Mother reported that her mother, Grandmother, had obtained legal guardianship of J.A.D. in 2011. The State filed a motion for finding of unfitness and termination of parental rights in May 2016.

At the termination hearing on March 1, 2017, the court heard from several witnesses: Dr. Laura Turner, mother's therapist; Cheryl Tan, Mother's medication provider; Brandon Jacobs, J.A.D.'s therapist; Susan Sommers, mother's substance abuse treatment provider; Josh Werth, Family Support Worker from Saint Francis Community Services (SFCS); Becky Douglas, J.A.D.'s former therapist; and Rebekah Thrush, case manager from SFCS. These witnesses testified about Mother's mental health and substance abuse issues, her unstable housing and financial situations, and J.A.D.'s anxiety, confusion, and frustration. We summarize their testimony below.

Mother has been diagnosed with bipolar disorder and has a history of substance abuse since she was a teenager. She also has a history of intermittent explosive disorder, ADHD, and ADD. Mother's mental health issues are intertwined with substance abuse, and both have been barriers in her ability to achieve reintegration with J.A.D. Although Mother expresses a desire to achieve sobriety, she has not been able to remain sober for extended periods of time, and her attendance at both group and individual therapy sessions has been inconsistent. Mother reported relapsing five times over the course of this case. Mother's relapses often involve abusing prescription medications such as Lortab and Percocet, and her positive UA tests show amphetamine use and methamphetamine use.

2

Mother's substance abuse negatively impacts her mental health, often worsening the symptoms of her bipolar disorder. When she is able to resist substance abuse, Mother functions fairly well, but her mental health symptoms are more pronounced when using drugs. Her personal therapist said: "The most important med issue is that she stays off meds that she should not be taking—meaning prescription pills that are not her prescription—and any other drugs. That is above all else." Mother's mood is much more stable when she is drug-free.

Mother did not consistently participate in substance abuse treatment. Despite relapsing just a few weeks prior, Mother told her substance abuse counselor that she wanted to take a break from treatment in November 2016. The counselor discouraged Mother from taking a break because people in treatment see the most benefit when their attendance is consistent. Despite her counselor's warning, Mother missed up to three weeks of sessions in November. Mother's attendance was also low in December 2016 and January 2017, but she attended enough sessions to prevent her file from being discharged so she remained in the program. The substance abuse counselor again recommended an inpatient treatment program for Mother to address her relapses and inconsistency in attendance. When her counselor recommended that Mother live in an Oxford House, a highly structured sober living facility, Mother declined, saying she did not think it was for her.

Mother also had monthly sessions with her medication provider. Mother chose to stop attending these sessions for a period of five months beginning in February 2016, then returned to monthly meetings in July 2016. During that time, Mother relapsed. Since July 2016, Mother has kept her monthly sessions with her medication provider.

Despite inconsistent and unreliable attendance with her substance abuse sessions, Mother has seen Turner, an individual therapist, with some consistency on a weekly basis since May 2015. Mother's goals through individual therapy are to achieve and maintain a

stable home life, obtain steady employment, and stabilize her moods. Turner reported that Mother has made significant progress toward living a sober life. Mother made decisions that indicated she is serious about achieving long-term sobriety, such as choosing to live alone to reduce the conflict with her family and to obtain control over her environment. However, Mother still struggles with stability in various aspects of her life, especially regarding housing and her mental health.

Along with her inconsistent participation in substance abuse treatment programs, Mother has not been fully compliant with court orders and case plans. As of February 17, 2017, just a few weeks before the termination hearing, Mother had achieved only one of the eight tasks ordered by the judge—to update her substance abuse evaluation and follow all recommendations. Two of the tasks (completing random UA's upon request and completing hair follicle testing every 90 days) were ongoing. Despite having had since August 2015 to make more progress, Mother had not achieved numerous tasks: obtain and maintain full time employment; obtain and maintain appropriate and stable housing; participate and attend individual therapy; and obtain a medication evaluation and follow all recommendations.

Mother's noncompliance was present throughout the case and is exemplified through her refusals to participate in UA and hair follicle testing. Mother refused hair follicle testing 24 times and refused UA testing 32 times. She had two negative hair follicle tests, one negative UA test, and two positive UA tests—one was positive for methamphetamines and one was positive for both methamphetamines and amphetamines.

Mother's employment throughout the case has been sporadic, leaving her financially unstable and without insurance. She reported that she now works at Costco, but has not provided any paystubs or other proof of her employment.

4

Mother struggles with stable housing and often relies on others. Mother's housing situation was often of concern throughout the case; at various times she has lived with boyfriends, Grandmother, and neighbors. In October 2015, Mother moved in with her boyfriend who was on house arrest. Mother's boyfriend was sanctioned to 60 days in jail for violating his probation and for possession of drug paraphernalia. During that time, Mother moved back in with Grandmother because Mother could not pay the bills. When Mother lives with Grandmother, they get into arguments, sometimes escalating to the point that Mother will leave the house and sleep outside. For those reasons, Thrush, case manager from SFCS, had concerns about reintegration into Grandmother's house.

In December 2015, Mother told Thrush that she was moving in with an older man that lived on her street, but she could not provide his name or information. Thrush was concerned because Mother was moving in with a man she did not seem to know much about, was dating her boyfriend while he was incarcerated, and was married to a man in prison. Upon her boyfriend's release from jail in March 2016, Mother moved back into his home. When they broke up in June, Mother called Thrush to report that she no longer had stable housing and finances. Mother moved back in with Grandmother.

At the time of the termination hearing, Mother had been in her current residence for about a week, a two-bedroom sober living facility that she shared with a roommate. When J.A.D. went to the apartment for a visit, Mother told him that they would share a bed. When he balked, Mother offered to get a bigger bed. After the visit concluded, J.A.D. asked Werth, his social worker, "Are they really going to make me sleep in the same bed with her?"

The inconsistencies in Mother's housing, employment, and participation in treatment was not due to a lack of resources and help from assigned case workers. Thrush offered to drive Mother to look for apartments, gave her a list of landlords to call, and provided resources about applying for Section 8 housing. The case achievement plan

5

completed by Thrush indicates that she provided Mother with resources for completing a substance abuse evaluation at no cost. Thrush testified that if Mother were not already seeing Turner, her individual therapist, on a regular basis, she would have provided a list of therapists for Mother to call. Thrush also gave Mother a bus pass to alleviate transportation concerns. However, Mother still used her lack of transportation as an excuse for not completing hair follicle and UA requests, stating both that she lost the bus pass and did not know the bus routes. Thrush offered to print out the bus routes for Mother, but Mother said someone else was printing them off for her. Mother later told Thrush that she gave her bus pass to a friend as a Christmas gift.

Thrush met with Mother many times to discuss the court orders and her progress in completing them. Mother seemed to minimalize the court orders or make excuses for not completing them. Additionally, when Thrush attempted to address Mother's behaviors, Mother would waive it off and respond that Thrush was not the parent that she was. Further, Thrush unsuccessfully tried to reach Mother at least 24 times via telephone call or text message. While Mother maintained visitation rights throughout the case, her continued relapses, failure to maintain stability, and tendency to act inappropriately during visits prevented her from progressing to longer visits, overnight visits, or unsupervised visits.

Some of Mother's actions seem to bribe J.A.D. She tells him that she will buy him anything he wants. Mother offers J.A.D. items such as money, toys, and puppies which are often conditioned on J.A.D. speaking favorably of her or coming back to live with her. When J.A.D. does not get the things that Mother promises him, he expresses disappointment and feels let down. Mother interacts with J.A.D. during every visit, but sometimes complains or does not participate in the activity he chooses.

Mother often behaves in ways that embarrass J.A.D. during their visits, acting inappropriately or immaturely. She asks for things for free or at a discounted price. At a

visit to an arcade, Mother convinced J.A.D. to put the skee-balls in the holes for the most points, instead of rolling them as designed. This continued until a manager came by and told them to stop. During one visit at the mall, Mother kissed J.A.D. all over his face, and she would not let him wipe off the bright red lipstick marks. After the visit concluded, J.A.D. was upset, and expressed that he felt humiliated.

Some of Mother's actions are not merely mood swings or unpredictable behavior, but are unsafe. For example, during one of J.A.D.'s supervised visits, Mother skipped through the street when a car was approaching. She was unphased by the potential danger, even singing "you can't hit me. You can't hit me." J.A.D. witnessed the event, and simply shook his head.

When it comes to talking about J.A.D.'s current placement, Mother avoids the topic. She does not like to speak with J.A.D. about school or his current foster family. For example, J.A.D. had an assignment at school about family. To describe his family, J.A.D. included Mother and Father, as well as his foster family, upsetting Mother.

Werth reported that like any 10-year-old boy, especially one in the foster care system, J.A.D. can be challenging. He is making some attachments in his foster home. J.A.D. has a close relationship with a male child in his foster family—J.A.D. feels like he is his brother and is someone with whom he feels safe and comfortable. Since J.A.D. has been at his foster home, he has participated in basketball and football, and he attends the YMCA after school. J.A.D. does not, however, like to discuss the possibility of being adopted. J.A.D. said he would feel comfortable becoming a member of his foster family through adoption, but also expressed a desire to continue his relationship with Mother if possible.

After hearing the testimony at the termination hearing, the district court found that Mother was "currently unfit by reason of conduct or condition which renders her unable

to care properly for the child, and the condition is unlikely to change in the foreseeable future." The district court cited K.S.A. 2017 Supp. 38-2269(b)(1), (b)(3), (b)(7), (b)(8), and (c)(3) as the factors applicable to this case. The district court considered the physical, mental, and emotional health of the child, contemplated the foreseeable future viewed through "child time," and determined that termination of Mother's parental rights was in the best interest of J.A.D. Mother appeals the court's termination order.

*Does clear and convincing evidence support termination of Mother's parental rights*?

Because a parent has a fundamental liberty interest in the relationship with his or her child, the State must prove the allegations of conduct that form the basis for termination by clear and convincing evidence. *Santosky v. Kramer*, 455 U.S. 745, 769-70, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008). When we review a district court's decision to terminate parental rights, we consider the evidence viewed in the light most favorable to the State, and determine whether we are convinced that a rational fact-finder could have found it highly probable, i.e., by clear and convincing evidence, that the parent's right should be terminated. *In re K.W.*, 45 Kan. App. 2d 353, 354, 246 P.3d 1021 (2011). In making this determination, we do not weigh conflicting evidence, evaluate the credibility of witnesses, or redetermine questions of fact. *In re B.D.-Y.*, 286 Kan. at 705.

A court may terminate parental rights when a child has been adjudicated a child in need of care (CINC) and when the court finds that the parent is unfit by "reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 2017 Supp. 38-2269(a). K.S.A. 2017 Supp. 38-2269(b) lists nonexclusive factors the court shall consider in making a determination of unfitness. The court must also consider a separate list of nonexclusive factors when a child is not in the parent's physical custody. K.S.A.

8

2017 Supp. 38-2269(c). Any single factor under the statute, standing alone, may establish grounds for termination. K.S.A. 2017 Supp. 38-2269(f); see K.S.A. 2017 Supp. 38-2271.

The district court found Mother unfit based on five statutory factors:

- K.S.A. 2017 Supp. 38-2269(b)(1): Emotional illness, mental illness, mental deficiency or physical disability of the parent, of such duration or nature as to render the parent unable to care for the ongoing physical, mental and emotional needs of the child;

- K.S.A. 2017 Supp. 38-2269(b)(3): The use of intoxicating liquors or narcotics or dangerous drugs of such duration or nature as to render the parent unable to care for the ongoing physical, mental, or emotional needs of the child;

- K.S.A. 2017 Supp. 38-2269(b)(7): Failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family;

- K.S.A. 2017 Supp. 38-2269(b)(8): Lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child; and

- K.S.A. 2017 Supp. 38-2269(c)(3): Failure to carry out a reasonable plan approved by the court directed toward the integration of the child into a parental home.

Our review of the evidence at the termination hearing shows that each of these factors was present and applies in this case.

9

*K.S.A. 2017 Supp. 38-2269(b)(1) and K.S.A. 2017 Supp. 38-2269(b)(3)*

As to Mother's mental health and substance abuse, Mother argues that no testimony linked her mental health and substance abuse issues to her inability to parent J.A.D. She also argues that the behavior described was merely embarrassing and impulsive, instead of behavior that reflected an inability to parent or provide for J.A.D. These contentions ignore the testimony from several witnesses that Mother's failure to address her mental health and substance abuse led to her inability to achieve long-term sobriety and to her failure to maintain stability in her life.

Mother has not shown an ability to remain sober for extended periods of time. She reported relapsing at least five times during the course of this case but she nonetheless insisted on taking a break from treatment. Mother went through periods of not wanting to move into sober living facilities which had high success rates, choosing instead to inconsistently attend substance abuse therapy. Moreover, Mother's substance abuse has had a negative impact on her mental health. Persons involved with Mother's mental health and substance abuse treatment testified that Mother's mental health symptoms, including those from her bipolar disorder, are prominent and unpredictable when she abuses drugs, exacerbating an unstable, unsafe, and unsuitable environment for J.A.D.

Thrush testified that it is not good for J.A.D. to see Mother when she varies between stages of hyperactivity and depression. Thrush worries about the impact of Mother's sporadic behavior on J.A.D., and testified that it is not healthy for him to watch Mother's mood swings and behaviors that indicate her focus is not on him. Mother's acts are more than sporadic behavior—they are at times unsafe. Mother argues that J.A.D. never expressed a concern for his own safety and was only embarrassed by Mother. But voicing safety concerns is a parental duty and not a child's.

10

The district court's determination of Mother's unfitness is supported by testimony and evidence that she is not committed to maintaining sobriety and improving her mental health. Substantial competent evidence supports the district court's determination that Mother's mental health and substance abuse impact her fitness to parent J.A.D., thus satisfying K.S.A. 2017 Supp. 38-2269(b)(1) and K.S.A. 2017 Supp. 38-2269(b)(3).

*K.S.A. 2017 Supp. 38-2269(b)(7), K.S.A. 2017 Supp. 38-2269(b)(8), and K.S.A. 2017 Supp. 38-2269(c)(3)*

Mother argues that the evidence was not sufficient to support the other three statutory factors the district court relied on—failure of reasonable efforts, K.S.A. 2017 Supp. 38-2269(b)(7); lack of effort on the part of the parent to adjust circumstances, K.S.A. 2017 Supp. 38-2269(b)(8); and failure to carry out a reasonable plan, K.S.A. 2017 Supp. 38-2269(c)(3). The court, however, heard extensive testimony and reviewed exhibits showing that Mother was not consistent in her attendance at treatment or individual therapy, continued to relapse, and failed to maintain a stable home and employment. Despite the efforts of SFCS employees to provide Mother with services, she struggled to stabilize her housing, finances, employment, and health, and her visits with J.A.D. for over two years never progressed beyond one hour per week supervised sessions.

Mother contends that she complied with all the tasks in her achievement plan other than providing paycheck stubs as proof of employment. But the record refutes that assertion. Her achievement plan detailed a number of goals, most of which remain uncompleted. Not only has Mother failed to show proof of steady employment, but she has insufficient and unstable housing, often relies on others, has been noncompliant with court-ordered UA and hair follicle requests, and has not followed through with the recommendations of her substance abuse evaluations. Mother contends that she complied with "most of the UA and HF while in treatment." This statement is inaccurate, as Mother

11

refused UA or hair follicle requests 57 times, tested negatively three times, and tested positively twice.

Mother was given ample time to make progress on other tasks from her achievement plan and court orders. The case was continued many times for Mother to make progress, and J.A.D was out of her custody for over two years. During those two years, Mother failed to follow through with case plan tasks and did not show the court that she could maintain stable housing and employment, achieve long-term sobriety, or provide financial and emotional stability for J.A.D. Instead, Mother continued abusing substances, failed to change her circumstances and conduct, and failed to make progress on her achievement plan and court order, thus satisfying K.S.A. 2017 Supp. 38-2269(b)(8) and K.S.A. 2017 Supp. 38-2269(c)(3).

As to the efforts of involved public and private agencies, clear and convincing evidence demonstrates that SFCS made reasonable efforts to rehabilitate the family and those efforts failed. Mother was given bus passes, lists of landlords, and access to transportation. She was provided with resources about government programs to help her with housing. Mother's therapists made continuous recommendations about treatment programs and sober living facilities and offered to print out bus routes and information for substance abuse evaluation at no cost to her.

The district court judge did note a lack of coordination of care between care providers. But the judge doubted the impact that further coordination would have made: "There is really no evidence to the effect that the coordination of care would have had a different outcome as to Mother as she sits here today and both her mental health and substance abuse issues." Mother does not show evidence on appeal to dispute that conclusion. We find that reasonable efforts were made by the agencies involved to help Mother, but those efforts failed to make a difference in rehabilitating the family, satisfying K.S.A. 2017 Supp. 38-2269(b)(8).

12

For parental rights to be terminated, Mother's behavior must be unlikely to change in the foreseeable future. See K.S.A. 2017 Supp. 38-2269(a). The term "foreseeable future" is measured from the child's perspective, and takes into account a child's perception of time. *In re S.D.*, 41 Kan. App. 2d 780, 790, 204 P.3d 1182 (2009). This court has considered periods of time as short as seven months to be the foreseeable future from a child's perspective. 41 Kan. App. 2d at 790. A court may predict a parent's future unfitness based on his or her past history. *In re Price*, 7 Kan. App. 2d 477, 483, 644 P.2d 467 (1982).

> "A parent may be labeled 'unfit' under the law even though he or she loves the child and wants to do the right thing, which may be the case here. But we must judge these cases based mostly upon actions, not intentions, and we must keep in mind that a child deserves to have some final resolution within a time frame that is appropriate from that child's sense of time." *In re A.A.*, 38 Kan. App. 2d 1100, 1105, 176 P.3d 237 (2008).

During the two years that J.A.D. was in custody, Mother continuously failed to participate in case plans, and she failed to progress to longer visits, unsupervised visits, or overnight visits. Thrush estimated that SFCS would recommend Mother be stable with mental health services, housing, and sobriety for at least one full year before it would be appropriate to seek integration with J.A.D. This adds at least another year to the earliest date at which J.A.D. could be reintegrated with Mother. Clear and convincing evidence supports the district court's determination that Mother was unfit and that her condition was unlikely to change in the foreseeable future.

*Did the trial court abuse its discretion in finding that termination is in the best interest of the child?*

Upon making a finding of unfitness of the parent, "the court shall consider whether termination of parental rights as requested in the petition or motion is in the best interests of the child." K.S.A. 2017 Supp. 38-2269(g)(1). Because it hears the evidence directly, the district court is in the best position to determine the best interests of the

13

child, and an appellate court should not overturn its decision without finding an abuse of discretion. *In re K.P.*, 44 Kan. App. 2d 316, 322, 235 P.3d 1255 (2010). An abuse of discretion occurs when no reasonable person would agree with the district court, or when the court bases its decision on an error of fact or an error of law. *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 2, 336 P.3d 903 (2014).

To evaluate whether termination of parental rights is in the best interest of the child, courts give primary consideration to the physical, mental, and emotional needs of the child. K.S.A. 2017 Supp. 38-2269(g)(1). If the court finds that the physical, mental, or emotional needs of the child would be best served by terminating parental rights, the court should do so. K.S.A. 2017 Supp. 38-2269(g)(1).

> "[T]he court must weigh the benefits of permanency for the children without the presence of their parent against the continued presence of the parent and the attendant issues created for the children's lives. In making such a determination, we believe the court must consider the nature and strength of the relationships between children and parent and the trauma that may be caused to the children by termination, weighing these considerations against a further delay in permanency for the children." *In re K.R.*, 43 Kan. App. 2d 891, 904, 233 P.3d 746 (2010).

Despite two years without J.A.D., Mother failed to show she could live a clean and sober life. She refused many UA and hair follicle test requests. Her housing was unstable, and she often had to rely on others for housing and financial assistance.

J.A.D. is certainly bonded with Mother—he is loyal to her and is protective of what he says about her, and he avoids talking about his future without her. Despite that bond, the two years in foster care have taken a toll on J.A.D. He has been diagnosed with adjustment reaction disorder with depression and specific trauma and stressor related disorder, and he also suffers from anxiety. J.A.D. expresses frustration and confusion regarding his lack of permanency. J.A.D. struggles with the unknown, and he struggles

14

with understanding why the case has taken so long to be resolved. J.A.D. is working with a therapist to reduce the symptoms of depression, process and address his experience in foster care, process his biological family dynamics, and discuss possible future outcomes.

The district court heard testimony regarding the significant amount of time J.A.D. had spent in state custody. Without termination, J.A.D.'s confusion, frustration, and anxiety about his unknown future would continue. J.A.D. would benefit from permanency. Werth fears that if J.A.D. continues to go without permanency, J.A.D. will struggle through his coming stages of development. A reasonable person could conclude that termination was in J.A.D.'s best interest. We find no abuse of discretion.

Affirmed.